IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALVIN HESS, | ) | CASE NO.  1:20-CV-01599-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Alvin Hess ("Plaintiff" or "Hess"), challenges the final decision of Defendant, Andrew

Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In February 2018, Hess filed an application for POD and DIB, alleging a disability onset date of

August 2, 2012[2] and claiming he was disabled due to COPD, asthma with COPD exacerbation, thoracic

spondylosis without myelopathy, cervical spondylosis without myelopathy, radiculopathy thoracic region,

s/p lumbar spinal fusion, neuropathic pain, inguinal pain, chronic pain syndrome, and Type 2 diabetes.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

[2] On July 29, 2016, an ALJ denied Hess' previous application for Title II benefits.  (Transcript ("Tr.") at
10.)  The ALJ assigned to Hess' 2018 application found no basis for reopening Hess' previous application
and dismissed Hess' application from August 2, 2012 through July 29, 2016 on the basis of *res judicata.*
(*Id.*)  Therefore, the earliest possible onset date is July 30, 2016.  (*Id.*)

(Transcript ("Tr.") at 10, 77.)  The application was denied initially and upon reconsideration, and Hess requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 10.)

On April 18, 2019, an ALJ held a hearing, during which Hess, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On May 29, 2019, the ALJ issued a written decision finding Hess was not disabled.  (*Id.* at 10-21.)  The ALJ' s decision became final on June 24, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On July 21, 2020, Hess filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17-18.)  Hess asserts the following assignments of error:

> (1)  Whether the ALJ committed reversible error in the assessment of Plaintiff's residual functional capacity when he failed to recognize Mr. Hess' need for a cane and a sit/stand option.

(Doc. No. 17.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Hess was born in December 1968 and was 50 years-old at the time of his administrative hearing (Tr. 10, 19), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  He has a limited education and is able to communicate in English.  (Tr. 19.)  He has past relevant work as a shop supervisor, production.  (*Id.*)

### B.  Relevant Medical Evidence[3]

On January 4, 2016, Hess saw primary care physician Timothy Bohn, M.D., for follow up after a recent hospitalization for pneumonia.  (Tr. 601.)  On examination, Dr. Bohn found Hess had audible diffuse

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Furthermore, since Hess challenges only the ALJ's physical findings, the Court's discussion of the evidence is further limited to his physical impairments.

wheezing on inspiration and expiration, a tachycardic heart rhythm, and no edema of the lower extremities. (*Id.*) Dr. Bohn recommended a one-week course of doxycycline for Hess' respiratory symptoms and a follow up chest x-ray in one month. (*Id.*) Dr. Bohn noted Hess was not able to be physically active except for walking, which had been limited recently because of his respiratory infection. (*Id.* at 602.)

A spirometry test conducted on January 19, 2016 demonstrated moderate obstruction with mildly reduced diffusing capacity. (*Id.* at 612.)

On January 21, 2016, Hess saw Dr. Muhammad Raza for a follow up appointment regarding his asthma, obstructive sleep apnea, and severe MRSA pneumonia for which he had been hospitalized three weeks before. (*Id.* at 316.) Hess reported he had been treated with antibiotics and was not feeling better. (*Id.*) Hess denied joint pain, joint swelling, back pain, and muscle pain. (*Id.* at 317.) On examination, Dr. Raza found Hess had a normal gait, normal and symmetric reflexes, and grossly intact sensation. (*Id.*) Dr. Raza noted the January 19, 2016 spirometry test showed mild obstructive ventilatory defect with air trapping, otherwise normal lung volumes, and normal diffusion capacity. (*Id.* at 318.)

On April 22, 2016, Hess saw Dr. Bohn for follow up after two weeks of coughing and wheezing. (*Id.* at 462.) Hess reported a recent alcohol relapse that caused him to go to Lutheran Hospital. (*Id.*) Hess also complained of moderate to severe back pain for which he had been working with pain management. (*Id.*) On examination, Dr. Bohn found expiratory wheezing diffusely bilaterally, tachycardic heart rate, and no edema of the lower extremities. (*Id.*) Dr. Bohn recommended a prednisone taper for Hess' asthma and continued his gabapentin and baclofen. (*Id.*) Dr. Bohn also continued Hess' tramadol and noted he did not recommend increasing it. (*Id.*)

On July 20, 2016, Hess saw Dr. Bohn for follow up. (*Id.* at 469.) Hess complained of increasing back pain after "shooting baskets" with his kids and told Dr. Bohn he had jumped up to grab the ball and when he landed, he had pain in his back and left leg. (*Id.*) Hess described the pain as severe and reported

an occasional feeling of weakness in his left leg as well as radiating paresthesias. (*Id.*) On examination, Dr. Bohn found Hess had an antalgic gait favoring his left leg and bent at the waist, no edema of the lower extremities, "up and go pain," no wheezes of the lungs, and thrush in the mouth. (*Id.*) Dr. Bohn diagnosed Hess with low back pain and strain secondary to activity and recommended Hess increase his gabapentin by one capsule. (*Id.*) Hess could also use tramadol, Diflusinal, and ice. (*Id.*) Dr. Bohn noted Hess had a consultation with neurosurgery scheduled for evaluation and possible surgery. (*Id.*) Hess requested oxycodone for pain management, which Dr. Bohn refused to prescribe. (*Id.*)

Chest x-rays taken on July 27, 2016 showed right-sided airspace opacities probably representing a pneumonic process, as well as degenerative changes in the spine. (*Id.* at 334.)

On August 31, 2016, Hess saw Dr. Bohn for follow up. (*Id.* at 476.) Hess reported he had "generally" been feeling well with "little to no swelling." (*Id.*) Dr. Bohn noted Hess' pain "seem[ed] adequately controlled." (*Id.*) On examination, Dr. Bohn found no wheezes or rales, regular heart rate and rhythm, and no edema of the lower extremities. (*Id.*)

On October 21, 2016, Hess saw Dr. Bohn for follow up. (*Id.* at 484.) Hess complained of chest tightness that radiated down his left arm to his elbow. (*Id.*) This chest pain happened with no activity and was different than the chest tightness caused by his asthma. (*Id.*) Hess reported not being physically active and complained of fatigue and shortness of breath with low levels of activity. (*Id.*) Dr. Bohn noted Hess had a "[s]trong family history of heart disease." (*Id.*) On examination, Dr. Bohn found Hess in no acute distress, wheezing of the lungs, tachycardic hear rate, and no edema of the lower extremities. (*Id.*) Dr. Bohn wanted Hess to undergo stress testing because of his chest pain but noted Hess could not perform a "treadmill stress test" due to "poor physical fitness and lumbar and thoracic spine issues." (*Id.*) A medicine-induced stress test conducted on October 28, 2016 showed "[n]o evidence of ischemia or infarction" and "average functional capacity for age and gender." (*Id.* at 494.)

4

On November 3, 2016, Hess saw Dr. Bohn for an "urgent visit" complaining of headache, nausea, and vomiting after falling off a ladder and hitting the back of his head. (*Id.* at 503.) Hess thought the ladder fell on his face. (*Id.*) He reported being unconscious but was unsure for how long. (*Id.*) Hess told Dr. Bohn he had been on the ladder trying to move a tree branch off his roof when his right knee and leg got caught in the ladder. (*Id.*) Hess reported he had gone to the emergency room where he received pain medication and antiemetic. (*Id.*) Hess went back to the emergency room on November 2, 2016 complaining of headache, nausea, and vomiting, and was again given pain medication and antiemetic. (*Id.*) Dr. Bohn noted Hess preferred to have the lights down. (*Id.*) Hess complained of nausea with vomiting, neck pain, headache, low back pain, and right knee pain. (*Id.*)

On examination, Dr. Bohn found no wheezes or rales of the lungs, fair air movement, regular heart rate and rhythm, and pain and tenderness of the right knee at the patellar tendon, the quadriceps tendon, and the medial and lateral collateral ligaments. (*Id.*) Hess demonstrated pain with flexion, extension, and palpation, although Dr. Bohn found no defect to the patellar or quadriceps tendon. (*Id.*) While Hess was guarding the knee, Dr. Bohn found no significant anterior or posterior drawer. (*Id.*) Dr. Bohn noted Hess had an antalgic gait. (*Id.*) Dr. Bohn diagnosed Hess with a right knee strain and sprain, which Dr. Bohn noted was "[d]ifficult to assess" because Hess was "guarding" the knee. (*Id.*) Dr. Bohn recommended use of a knee immobilizer over the next few days, simple active range of motion of the knee, icing the knee, and icing the back of the head. (*Id.*)

On November 17, 2016, Hess underwent an EMG study which revealed mild chronic motor axon loss bilaterally at L5-S1, innervated muscles consistent with chronic intraspinal canal lesions affecting these root segments, and absent bilateral sural sensory nerve responses which could be intraspinal in etiology but may also be secondary to mild/early peripheral. (*Id.* at 345-46.)

On November 18, 2016, Hess saw Dr. Jeremy Amps for follow up after the November 17, 2016

EMG.  (*Id.* at 350.)  Hess reported "constant low back pain" that had begun 14 years ago after back surgery and which had worsened over time.  (*Id.*)  Hess stated he took tramadol for the pain.  (*Id.*)  Hess complained that his left leg gave out on him daily if he walked longer than five minutes.  (*Id.*)  Hess reported the pain went down his left buttock and the back of his left leg to his calf.  (*Id.*)  Hess also complained of "[s]ome numbness" in his left calf and right front thigh over the past few years.  (*Id.*)  Hess rated his pain as an 8/10 and described it as sharp, dull, and continuous.  (*Id.* at 351.)  Walking and sitting for long periods of time made his pain worse, while medication helped it.  (*Id.*)  On examination, Dr. Amps found normal range of motion of the spine, 5/5 strength in all muscle groups, a tremor of the legs during strength testing, normal sensation, and normal gait.  (*Id.* at 353.)  Dr. Amps noted he "d[id] not see a clear role for surgery" and thought Hess "may be a candidate for the chronic pain program."  (*Id.*)

On November 28, 2016, Hess saw Dr. Raza for follow up.  (*Id.* at 357.)  Hess complained of a productive cough and wheezing.  (*Id.*)  Dr. Raza thought Hess had another exacerbation coming.  (*Id.*)  Dr. Raza also noted Hess wanted him to write a letter in support of Hess' disability application.  (*Id.*)  Hess denied joint pain, joint swelling, back pain, and muscle pain.  (*Id.* at 358.)  On examination, Dr. Raza found expiratory wheezing in the bases of the lungs, normal extremities with no deformities, edema, or skin discoloration, normal gait, normal and symmetric reflexes, and intact sensation.  (*Id.*)  Dr. Raza noted Hess' chest CT was compatible with pneumonia.  (*Id.* at 359.)  Dr. Raza diagnosed Hess with acute exacerbation of his obstructive lung disease and prescribed a dose of Z-pak and a five-day course of steroids.  (*Id.*)  Dr. Raza also encouraged Hess to use Spiriva every day in addition to his Advair and to use DuoNeb when necessary.  (*Id.*)

That same day, Dr. Raza wrote a letter stating he had treated Hess since 2014 for asthma and COPD.  (*Id.* at 366.)  Dr. Raza opined Hess' "ability to perform daily life activities [was] limited by his underlying lung disease and history of blood clots in the lungs."  (*Id.*)

On December 23, 2016, Hess saw Dr. Emad Daoud for follow up regarding his lumbar radiculopathy. (*Id.* at 381.) Dr. Daoud noted Hess had seen Dr. Amps and was not a surgical candidate at this time. (*Id.*) Hess complained of constant pain that he described as burning, dull, and aching and rated as an 8/10. (*Id.* at 382.) Hess told Dr. Daoud the pain radiated to his groin. (*Id.*) Hess reported his pain reduced his social activities and caused him to have difficulty using stairs and be cautions when he was walking. (*Id.*) Hess also complained of some weakness in his left leg that was occasionally associated with an inability to stand. (*Id.* at 383.) Hess also reported a couple of falls. (*Id.*) On physical examination, Dr. Daoud found Hess was able to move from sitting to standing with some difficulty, walked with an antalgic gait, had difficulty walking on heels and toes, had a limited range of motion in the lumbar spine, and had "slightly weaker" motor function on the left side. (*Id.*) Motor function on the right was normal. (*Id.*) Dr. Daoud found normal sensation and deep tendon reflexes, as well as a negative straight leg raise test bilaterally. (*Id.*) Dr. Daoud recommended Hess be evaluated for the chronic pain rehabilitation program. (*Id.* at 384.)

On January 4, 2017, Hess saw Dr. Bohn for follow up. (*Id.* at 388.) Hess reported a recent respiratory infection with exacerbation was improving. (*Id.*) Hess complained of continued paresthesias in his lower extremity and back pain. (*Id.*) On examination, Dr. Bohn found Hess was "[t]remulous with a low amplitude high frequency type tremor," no wheezing or rales of the lungs, tachycardic heart rhythm, no edema of the lower extremities, and thrush in the throat. (*Id.*) Dr. Bohn prescribed a straight cane for "balance and gait" due to "[d]egenerative disc and joint disease of the thoracic and lumbar spine" and "idiopathic peripheral neuropathy." (*Id.*)

On January 6, 2017, Dr. Bohn provided a letter in support of Hess' disability application. (*Id.* at 392.) Dr. Bohn noted the results from the EMG study and imaging of the thoracic and lumbar spine. (*Id.* at 392-93.) Dr. Bohn opined Hess was "not recommended to perform manual labor" and was "restricted"

from lifting, bending, pushing, pulling, stooping, crawling, climbing ladders, and temperature extremes, with "limited use of foot pedals." (*Id.* at 394.) Dr. Bohn "recommended consideration for medical disability." (*Id.*)

On January 25, 2017, Hess saw Dr. Abdallah Kabbara for a new evaluation of right groin pain. (*Id.* at 936.) Dr. Kabbara noted Hess had last been seen in February 2010 for ilioinguinal and genitofemoral neuralgia that was treated with radiofrequency ablation. (*Id.*) Hess reported his groin pain recently reoccurred and his pain management doctor did not perform radiofrequency ablation. (*Id.*) Hess asked to be considered for a repeat of his treatment. (*Id.*) On examination, Dr. Kabbara found limited flexion and extension of the back but no tenderness to palpation of the facet joints, and non-tender extremities with full range of motion, normal appearance, no edema, normal and symmetrical power, and normal sensation, although reflexes were diminished symmetrically. (*Id.* at 938-39.) Dr. Kabbara recommended a genitofemoral and ilioinguinal nerve block, and, if the response was positive, to then have another denervation with radiofrequency ablation. (*Id.* at 939.) Dr. Kabbara recommended against the use of any opioid therapy. (*Id.*)

On February 9, 2017, Hess underwent a radiofrequency ablation and right ilioinguinal nerve block that provided "greater than 85 percentile relief" for more than 48 hours. (*Id.* at 940-41.)

On February 14, 2017, Dr. Bohn provided a new prescription for a cane due to "abnormality of gait [R26.9]." (*Id.* at 398.)

On February 20, 2017, Hess saw Dr. Bohn for follow up after falling in his garage. (*Id.* at 518.) Hess told Dr. Bohn his left leg gave out when using his cane and, to control his fall, he fell backwards to the left into his snowblower, injuring his neck and upper back. (*Id.*) Hess went to the emergency room on February 15, 2017, where CT imaging revealed no acute injury but showed ongoing degenerative changes and spurring. (*Id.*) Hess denied any numbness or tingling. (*Id.*) On examination, Dr. Bohn found

"marked" tightness, pain, tension, and increased turgor of the trapezius, left more than right, clear lungs, normal heart rate and rhythm, and no edema of the lower extremities. (*Id.*) Dr. Bohn diagnosed Hess with a cervical spine strain and sprain with muscle spasm and prescribed baclofen. (*Id.*)

On February 23, 2017, Hess went to the emergency room after falling the day before when his leg gave out. (*Id.* at 700.) Hess reported he was walking out of the bathroom when he fell forward, hitting his head on a wall and landing on his left shoulder. (*Id.*) Hess denied any dizziness or lightheadedness before falling and denied loss of consciousness afterward. (*Id.*) Treatment providers noted Hess "admits to chronic left lower leg ataxia and weakness" and stated he fell frequently. (*Id.*) Hess reported he could not raise his left shoulder and had pain with rotating his neck to the left. (*Id.* at 701.) On examination, Lindsay Gilchrist, PA, found pain with rotational movement of the neck to the left, left shoulder pain over the joint line and proximal humerus, pain with left arm extension, an inability to extend the left arm 90 degrees secondary to pain at the shoulder, and 5/5 grip strength bilaterally. (*Id.* at 703.) X-rays taken that day revealed no acute injury but showed mild degenerative changes of the left acromioclavicular joint. (*Id.* at 704.) A CT scan of the cervical spine showed "stable degenerative changes" with no acute fracture. (*Id.*) Gilchrist provided a prescription for Percocet, a soft collar, and a shoulder sling, and advised Hess to follow up with his primary care physician in five to seven days. (*Id.* at 704-05.)

On February 26, 2017, Hess returned to the emergency room complaining that his neck and shoulder pain continued, and his neck was stiffer. (*Id.* at 729.) Hess described the pain as moderate and reported Percocet and Flexeril alleviated the pain, while moving his neck or shoulder exacerbated it. (*Id.* at 730.) On examination, treatment providers found normal range of motion, left paraspinal and scapular tenderness, an inability to abduct his left shoulder due to pain, and equal grip strength bilaterally. (*Id.* at 732.) X-rays of the cervical spine confirmed mild degenerative changes of the left acromioclavicular joint and prominent cervical anterior osteophytosis and multiple joints, largest at C2-3 and C6-7. (*Id.* at 740.)

Jillian Digeronimo, RN, noted Hess left the emergency room "in stable condition with [a] steady gait." (*Id.* at 729.)

On March 1, 2017, Hess returned to the emergency room for the third time complaining of persistent neck pain and stiffness. (*Id.* at 755.) Hess denied his pain was worse or different, but he ran out of Percocet that morning and was concerned that he was not staring to feel better. (*Id.*) Hess reported "chronic issues with ambulation" and that his left leg gave out on him randomly. (*Id.*) Hess told treatment providers Percocet and Flexeril helped his pain, and he had seen some improvement using the shoulder sling. (*Id.* at 756.) On examination, treatment providers found tenderness of the left trapezius but not of the spinous process, decreased range of motion of the neck, and 5/5 bilateral upper extremity flexion, extension, and grip strength. (*Id.* at 757-58.) Kailey Bachir, PA, prescribed a "short course of Percocet" after Hess explained his primary care physician was out of town until next week and he had scheduled a follow up visit. (*Id.* at 759.) Theresa Holloway, RN, observed that Hess "[a]mbulated after discharge without difficulty." (*Id.* at 754.)

On March 6, 2017, Hess saw Oksana Chesterfield, PA, for follow up after his most recent emergency room visit. (*Id.* at 1063.) Hess reported his left knee tended to give out on him and he had been diagnosed with neuropathy. (*Id.*) Chesterfield noted Hess was scheduled to see orthopedics for the first time the following week. (*Id.*) Hess complained of pain in his left shoulder up into his neck that prevented him from sleeping. (*Id.* at 1065.) It hurt to turn his head to the left, look up, and move his shoulder. (*Id.*) Hess reported the pain was keeping him from sleeping. (*Id.*) On examination, Chesterfield found limited range of motion of the neck and left shoulder. (*Id.*) Chesterfield noted Hess did not want to lift his left arm because of pain. (*Id.*) Hess was to see Dr. Bohn later that month. (*Id.*)

On March 20, 2017, Hess saw Dr. Bohn for follow up. (*Id.* at 1074.) Hess reported continued left shoulder pain and was using a sling. (*Id.*) Dr. Bohn recommended physical therapy and a knee brace for

support. (*Id.*) Hess also complained of a productive cough, shortness of breath with routine activities and walking, and wheezing. (*Id.*) On examination, Dr. Bohn found expiratory wheezes in the lungs bilaterally, with the left more than right, congestion, rhonchi, no rales, and trace pitting edema of the lower extremities. (*Id.*) Dr. Bohn noted Hess was working with physical therapy, had seen orthopedics regarding his fall, and was using a knee brace. (*Id.*) Dr. Bohn recommended compression stockings and a reduction of salt intake for the edema. (*Id.*)

On April 8, 2017, Hess saw Dr. Bohn on an urgent basis with symptoms of cough, wheezing, and shortness of breath. (*Id.* at 926.) Hess also complained of chest tightness and an inability to catch his breath. (*Id.*) On examination, Dr. Bohn found Hess audibly wheezing, expiratory wheezes in the lungs diffusely and bilaterally, and trace to 1+ edema of the lower extremities. (*Id.*) Dr. Bohn diagnosed Hess with "[a]sthma moderate persistence in exacerbation." (*Id.*) Nebulizer treatment in the office helped, improving Hess' wheezing and shortness of breath. (*Id.*) Dr. Bohn prescribed a prednisone taper and a new nebulizer. (*Id.*)

On April 19, 2017, Hess saw Dr. Kabbara for follow up. (*Id.* at 942.) Hess complained of groin pain, mostly in the right, that he rated a 5-6/10 and which he described as constant, dull, and sharp. (*Id.*) Hess denied extremity pain, calf pain, leg pain, neck pain, back pain, joint pain, ankle swelling, leg swelling, swollen glands, and recent injury or falls. (*Id.*) On examination, Dr. Kabbara found normal power of the upper and lower extremities bilaterally, normal sensation to light touch of the upper and lower extremities bilaterally, normal gait, full range of motion, intact sensation and motor strength, no tenderness, and no edema. (*Id.*) Hess confirmed the radiofrequency ablation had helped his pain, but this pain was one to two inches above where he had the last ablation. (*Id.* at 943.) Dr. Kabbara noted Hess would be scheduled for a right ilioinguinal nerve block. (*Id.*)

On April 28, 2017, Hess went to the emergency room after a piece of wood fell on his shoulder

when he was working in his house the day before, causing him to fall onto his backside.  (*Id.* at 969.)  Hess complained of left shoulder pain and low back pain but denied any numbness or tingling.  (*Id.*)  On examination, treatment providers found normal range of motion, tenderness of the left shoulder and lumbar back, and normal coordination.  (*Id.* at 971-72.)  X-rays taken that day showed no acute fracture but revealed moderate narrowing and spurring at the acromioclavicular joint.  (*Id.* at 949, 972.)

On May 2, 2017, Hess underwent another right genitofemoral nerve block.  (*Id.* at 944.)

On May 11, 2017, Hess saw Victoria Corell, NP, for follow up.  (*Id.* at 945.)  Hess complained of right groin pain that he rated a 7/10 and that he described as constant, sharp, and achy.  (*Id.*)  Hess endorsed back pain and groin pain but denied extremity pain, joint pain, and leg swelling.  (*Id.*)  Hess reported 70% pain relief from his previous nerve block that lasted for three to four days.  (*Id.* at 946.)  On examination, Corell found normal power, tone, and sensation of the lower extremities bilaterally, normal gait, and full range of motion of the extremities.  (*Id.* at 945.)  Corell noted Hess would be scheduled for a radiofrequency ablation for pain control.  (*Id.* at 946.)

On May 15, 2017, Hess went to the emergency room complaining of groin pain after lifting a "very heavy" planter three days earlier.  (*Id.* at 975.)  Hess reported "intermittent sharp stabbing severe pain of his right groin" since then.  (*Id.*)  Walking and exertion exacerbated the pain, while lying back and resting alleviated it.  (*Id.*)  Hess denied back pain.  (*Id.* at 977.)  A physical examination revealed tenderness to palpation of the right groin/inguinal ligament.  (*Id.*)

The next day, Hess returned to the emergency room after Dr. Bohn recommended he be seen there for further evaluation.  (*Id.* at 980.)  Dr. Jeffrey Ruwe noted an ultrasound the day before had been negative for a hernia.  (*Id.*)  Hess complained of 10/10 right groin pain that was worse with any movement and better with arching his back.  (*Id.*)  Hess denied nausea and vomiting.  (*Id.*)  On examination, Dr. Ruwe found tenderness of the left lower quadrant, no hernia, and normal range of motion.  (*Id.* at 982.)

On May 17, 2017, Hess returned to the emergency room for a third time stating he had a hernia in his right groin and complaining of nausea and vomiting since the day before. (*Id.* at 985.) Treatment providers noted Hess was scheduled to see surgery the next day. (*Id.*) Hess reported "excruciating, stabbing, constant" lower abdominal pain on the right and right groin pain that was worse with any movement. (*Id.*) Hess stated he had been "vomiting nonstop" for the past three days and had been unable to keep Percocet down. (*Id.*) On examination, treatment providers found abdominal and right inguinal tenderness but no hernia. (*Id.* at 987.) Treatment providers admitted Hess as they were unsure of the cause of the abdominal pain. (*Id.* at 988.) On examination, Hess had normal range of motion in his back and "grossly intact" sensation. (*Id.* at 994.) There was no inguinal or femoral hernia, although a ventral hernia was noted as positive. (*Id.*) Treatment notes reflect Hess likely pulled his right groin muscle. (*Id.* at 1003.) At discharge, Hess had normal extremities and "grossly normal" motor function. (*Id.* at 1004.)

On May 24, 2017, Hess again returned to the emergency room complaining of worsening right groin pain. (*Id.* at 1009.) Hess reported he was out of pain medication. (*Id.*) Hess denied back pain, myalgias, and neck stiffness. (*Id.* at 1011.) On examination, Terry Bann, PA, found normal range of motion of the neck, no abdominal tenderness, no hernia, normal range of motion of the musculoskeletal system, and no edema or tenderness of the extremities. (*Id.* at 1011-12.) Bann informed Hess all his tests were normal, and he had been given multiple prescriptions for Percocet. (*Id.* at 1012.) Bann would not refill the Percocet and told Hess he could take Ultram, Motrin, and Flexeril instead. (*Id.*) Bann directed Hess to follow up with his primary care physician and surgery. (*Id.*)

On May 31, 2017, Hess underwent another radiofrequency ablation. (*Id.* at 947.)

On September 6, 2017, Hess went to the emergency room complaining of groin pain after changing his wife's tire the night before. (*Id.* at 1014.) On examination, Joseph Lally, M.D., found no focal area of pain in the right side of the abdomen, no inguinal bulging, no hernia, no fullness in the

inguinal canal, and normal range of motion. (*Id.* at 1016.)

On November 8, 2017, Hess saw Dr. Bohn for follow up. (*Id.* at 1138.) Hess complained of back and abdominal pain, and his wife reported "significant and limiting" forgetfulness that was causing problems at home. (*Id.*) On examination, Dr. Bohn found clear lungs, tachycardia, and no edema of the lower extremities. (*Id.*) Dr. Bohn recommended neuropsychological testing for the symptoms of cognitive decline. (*Id.*)

### 1. Medical evidence after expiration of Hess' insured status on December 31, 2017

On January 10, 2018, Hess saw Dr. Bohn for follow up. (*Id.* at 1147.) Hess described an episode where he left to attend an AA meeting and ended up driving elsewhere, unsure of how he got there. (*Id.*) Since stopping baclofen he had not been confused or foggy. (*Id.*) On examination, Dr. Bohn found wheezing of the lungs diffusely, regular heart rate and rhythm, and no edema of the lower extremities. (*Id.*) Dr. Bohn discontinued Hess' baclofen. (*Id.*) Dr. Bohn noted chronic moderate to severe pain, for which Hess was on chronic opioids, as well as using a TENS unit. (*Id.*)

On January 13, 2018, Hess went to the emergency department complaining of a productive cough and shortness of breath. (*Id.* at 1018.) On examination, Christopher P. Murphy, D.O., noted Hess was slightly out of breath when talking. (*Id.* at 1020.) Dr. Murphy found no edema or tenderness, normal muscle tone, and normal coordination. (*Id.*) A chest x-ray showed signs of right lung pneumonia. (*Id.* at 1022.) Hess was also diagnosed with influenza and an upper respiratory infection. (*Id.*) Treatment providers admitted Hess to the hospital. (*Id.*)

A chest CT scan taken on January 14, 2018 revealed patchy right apical groundglass attenuation opacities new since June 13, 2017, mild right middle lobe and left lower lobe peribronchial nodules, suggestive of nonspecific small airway inflammation, mildly worse since June 13, 2017, a stable 3-mm right upper lobe pleural-based nodule bilaterally, and interval resolution of a 6-mm left upper lobe perivascular

nodule laterally since June 13, 2017. (*Id.* at 963.) Treatment providers discharged Hess on January 15, 2017 when Hess insisted on going home that day. (*Id.* at 1030.) Treatment providers noted significant improvement with treatment. (*Id.*)

On January 17, 2018, Hess returned to the emergency room complaining he was still coughing and exhibiting symptoms of pneumonia. (*Id.* at 1036.) Hess denied edema and extremity pain. (*Id.*) Hess further denied back pain, myalgias, neck pain, and neck stiffness. (*Id.* at 1038.) On examination, treatment providers found normal range of motion, no edema, equal movement of all extremities, and no tenderness to palpation. (*Id.*) Hess was once again admitted to the hospital. (*Id.* at 1041.) On January 20, 2018, treatment providers found normal extremities, no edema, and grossly normal cognition and motor function on examination. (*Id.* at 1058.) Hess was discharged that day. (*Id.*)

On March 7, 2018, Hess saw Dr. Bohn for follow up. (*Id.* at 1156.) Hess reported trying to discontinue his gabapentin but then "quickly" recognized how much it was helping his back pain. (*Id.*) On examination, Dr. Bohn found clear lungs, although some cough and some wheeze were noted, no edema of the lower extremities, and no tremor. (*Id.*) Dr. Bohn noted Hess found gabapentin "very helpful" with his back pain. (*Id.*)

On April 10, 2018, Hess saw Deena Khabbaza, M.D., for asthma and shortness of breath. (*Id.* at 1452.) On examination, Dr. Khabbaza found no edema of the lower extremities, normal extremities, intact sensation, and normal gait. (*Id.* at 1457.) Dr. Khabbaza noted Hess' asthma was not well controlled. (*Id.* at 1458.)

On April 13, 2018, Dr. Bohn opined that Hess' moderate to severe back pain "limits physical activity of all types." (*Id.* at 1583.) Dr. Bohn further opined Hess required "position change ad lib" as he had pain with sitting and standing and prolonged walking. (*Id.*) Dr. Bohn also opined Hess could not lift, squat, push, pull, crawl, or climb. (*Id.*)

On August 10, 2018, Hess saw Dr. Bohn for follow up after injuring himself "riding on a 4 wheeler." (*Id.* at 1624.) Dr. Bohn noted Hess was seen in the emergency room and a CT scan of the brain and neck showed "[n]o fractures but significant degenerative changes were noted in the neck." (*Id.*) Hess reported walking and changing his diet, which Dr. Bohn found had resulted in a reduction in Hess' pant size. (*Id.*) On examination, Dr. Bohn found no wheezing or rales in the lungs, tachycardia, and lower extremities with no edema. (*Id.*) Dr. Bohn diagnosed Hess with a cervical spine strain/sprain secondary to a fall with muscle spasm. (*Id.*) Dr. Bohn prescribed massage therapy. (*Id.*)

On August 30, 2018, Hess saw Shrif Costandi, M.D., for a "chronic pain consult." (*Id.* at 1632s.) Hess complained of back pain for the past seven months that radiated to his right leg. (*Id.*) Hess described the pain as constant, burning, stabbing, and throbbing and could range from a 4/10 at best and a 10/10 at worst. (*Id.*) Hess rated his current pain as an 8/10. (*Id.*) Hess told Dr. Costandi pain interfered with physical activity, walking, and lifting. (*Id.*) Walking and standing exacerbated his pain, while medications alleviated it. (*Id.*) On examination, Dr. Costandi found no pain to palpation of the lumbar spine but tenderness of the paraspinal muscles bilaterally, full range of motion of the back, good range of motion of the neck, normal extremities with no edema, normal muscle strength and tone, decreased sensation on the right side, and normal gait. (*Id.* at 1636.) Dr. Costandi discouraged long-term opioid therapy, recommended physical therapy, and recommended L3 transforaminal epidural steroid injections bilaterally. (*Id.* at 1637.)

On September 4, 2018, Hess saw David Kwon, NP, for a psychiatric evaluation. (*Id.* at 1609.) Kwon noted Hess had normal gait, station, muscle strength, and tone. (*Id.*)

On September 20, 2018, Hess saw Roxana Siles, M.D., for an evaluation of allergy/immunology disorders. (*Id.* at 1644.) On examination, Dr. Siles found Hess moved all extremities and sensation was grossly intact. (*Id.* at 1647.)

On October 1, 2018, Hess saw Dr. Kabbaza for follow up. (*Id.* at 1664.) On examination, Dr. Kabbaza found no lower extremity edema, normal extremities, intact sensation, and normal gait. (*Id.* at 1668-69.) Dr. Kabbaza noted the persistent 5 mm pleural-based nodule in the upper lobe of the right lung appeared stable. (*Id.* at 1669.)

That same day, Hess saw Kwon for mental health follow up and reported he had been at Cedar Point the day before. (*Id.* at 1733.) Hess further reported that on the weekends he went out with his wife, went to movies, and ate at restaurants. (*Id.*)

On October 29, 2018, Hess saw Kwon for follow up and reported doing more around the house, including painting the kitchen, changing the oil on his snow blower, and getting ready to put up Christmas lights. (*Id.* at 1735.)

On November 23, 2018, Hess saw Kelly Kuenzle, APRN, CNP, for shortness of breath and a non-productive cough. (*Id.* at 1702.) Kuenzle noted a hospitalization from November 5, 2018 to November 6, 2018 for "significant shortness of breath and wheezing." (*Id.*) Hess denied joint pain, back pain, and muscle pain. (*Id.* at 1706.) On examination, Kuenzle found a stable gait. (*Id.*) Kuenzle continued Hess' medications and ordered lab cultures. (*Id.* at 1709.)

On March 9, 2019, Hess went to the emergency room complaining of leg and hand swelling after a colonoscopy. (*Id.* at 1763.) On examination, treatment providers noted Hess had no gait or balance disturbance. (*Id.* at 1765.)

On March 25, 2019, Dr. Bohn completed a Medical Source Statement regarding Hess' physical capacity. (*Id.* at 1822-23.) Dr. Bohn opined Hess could lift 10 pounds occasionally and five pounds frequently, stand and walk for four hours total and one to two hours without interruption, sit for eight hours total and one to two hours without interruption, and rarely climb, balance, stoop, crouch, kneel, and crawl. (*Id.* at 1822.) Dr. Bohn stated Hess "needs up ad lib." (*Id.*) Dr. Bohn noted Hess had a cane and

walker prescribed "in [the] past." (*Id.* at 1823.)  Dr. Bohn opined Hess needed to elevate his legs to 120

degrees at will and would require additional breaks.  (*Id.*)

## C.    State Agency Reports

On April 14, 2018, Dimitri Teague, M.D., adopted the ALJ's previous RFC dated July 29, 2016

pursuant to Administrative Ruling 98-4 ("*Drummond* Ruling").  (*Id.* at 80.)

On June 4, 2018, on reconsideration, Anne Prosperi, D.O., found: "On Recon the clmt alleges in

4/2018 which is after the DLI. The initial administrative medical finding and all MER have been

reviewed.  The initial assessment adopting the 7/29/16 ALJ decision remains consistent w/ and supported

by the evidence." (*Id.* at 85.)

## D.    Hearing Testimony

During the April 18, 2019 hearing, Hess testified to the following:

- He cannot stand up for long periods of time and he has to "walk everywhere with a cane." (*Id.* at 45.)  He started using the cane in February 2017 because his knee would give out on him no matter what. (*Id.*)  His doctors still do not know why and he is still going through testing. (*Id.*)  He fell a couple of times in 2017 when his knee gave out. (*Id.* at 46.)  He must use the cane no matter where he goes in his house because he never knows when his knee is going to give out. (*Id.* at 47-48.)

The ALJ invoked *Drummond* and found Hess had past relevant work as a machine shop

supervisor.  (*Id.* at 48.)  The ALJ then posed the following hypothetical question:

> For this hypothetical I'm going to ask to [sic] assume an individual who at the date last insured was 49 years old, has a 7th grade limited education but can read and write, perform simple arithmetic, and whose work background is the machine shop supervisor.  This individual is limited to work with sedentary exertional requirements but has additional non-exertional limitations, specifically no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; no concentrated exposure to temperature extremes, humidity of [sic] environmental pollutants; no exposure to hazards such as heights, machinery, commercial driving; and a mental limitation that he can perform simple routine tasks in a low stress environment, no fast-paced or quotas or frequent changes; and having superficial interpersonal interactions, specifically no arbitration, negotiation or confrontation.

(*Id.* at 49.)

The VE testified the hypothetical individual would not be able to perform Hess' past work as a machine shop supervisor. (*Id.*) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as a patcher, touch-up screener, and table worker. (*Id.* at 50.)

Counsel for Hess asked the VE whether a hypothetical individual needing a sit/stand at will option and needing to use a cane for standing and walking could perform the identified sedentary jobs. (*Id.* at 51.) The VE testified that combination would result in a sit/stand option with one extremity, and the VE was "not familiar with unskilled sedentary jobs that allow for that." (*Id.*)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in

order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Hess was insured on July 30, 2016, the earliest possible onset date after the prior ALJ's decision, and remained insured through December 31, 2017, his date last insured ("DLI"). (Tr. 10-11.) Therefore, in order to be entitled to POD and DIB, Hess must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.

2. The claimant did not engage in substantial gainful activity during the period from July 30, 2016 through his date last insured of December 31, 2017 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: asthma; degenerative disc disease of the lumbar spine with lumbar radiculopathy,

status post laminectomy and fusion; degenerative changes of the cervical and thoracic spine; obesity; diabetes mellitus; essential hypertension; depressive disorder; mild neurocognitive disorder; polysubstance abuse, in reported remission (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity (20 CFR 404.1545) to perform sedentary work as defined in 20 CFR 404.1567(a), except he can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; cannot have concentrated exposure to hazards, including heights, machinery and commercial driving; and mentally, he is limited to performing simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (no arbitration, negotiation or confrontation) (20 CFR 404.1569a).

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December **, 1968 and was 49 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 30, 2016 through December 31, 2017, the date last insured (20 CFR 404.1520(g)).

(Tr. 12-21.)

# V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.  Hess' Need for a Cane

Hess argues the ALJ erred in failing "to consider and evaluate evidence" regarding his need for and reliance upon a cane. (Doc. No. 17 at 12.) Hess acknowledges the ALJ noted Hess' testimony that he needed a cane to walk and that there were times his knee gave out. (*Id.* at 13.) However, Hess asserts, "At no point did the ALJ directly address the medical evidence supporting [his] need for a cane." (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's finding that Hess did not need a cane during the relevant period. (Doc. No. 18 at 11.) The Commissioner argues that none of the

evidence cited by Hess establishes that a cane was medically necessary as required under SSR 96-9p, and therefore Hess' argument should be rejected. (*Id.* at 15.) The Commissioner asserts that the ALJ's failure to mention specific evidence does not mean that it was not considered. (*Id.* at 15 n.4) (quoting *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005)).

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

SSR 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular

facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996). Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). While the Sixth Circuit has not directly ruled on this issue, other courts in this district have noted that, in cases involving assistive devices including a cane, documentation "describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p. *McGill v. Comm'r of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019), *citing Carreon v. Massanari*, 51 F. App'x at 575; *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

The ALJ found as follows with respect to Hess' need for a cane:

The claimant's allegations revolve mostly around chronic low back pain and limitations (B3E; Hearing Testimony). He advised that during the relevant period he had limitations with standing and walking and said that he required a cane for ambulation (Hearing Testimony). He estimated being able to walk for up to 10 minutes at a time and lift up to 20 pounds (B3E). He reported that he also had episodes of his knee giving out in 2017, which resulted in some falls, one of which caused a shoulder injury (Hearing Testimony). The claimant indicated that his low back pain has been addressed with surgery, injections, spinal cord stimulation and medication (Hearing Testimony). He said that none of the treatment was helpful (Hearing Testimony).

* * *

The claimant's chronic back pain and limitations were addressed with surgery, physical therapy, injections and medication with relatively good results and while physical examinations have found decreased range of motion in the spine and antalgic gait, they have also noted normal strength, normal sensation, normal range of motion, normal gait and negative straight leg raise testing (B3F; B4F; B8F; B11F; B17F; B18F; B22F; B24F). Radiology studies of the lumbar spine have shown satisfactory fusion at L5-S1, along with disc bulges at L3-L4 and L4-L5 with moderate neural foraminal stenosis at L4-L5 (B24F/17). In August 2016, the claimant's pain was said to be adequately controlled (B11F/78). The claimant attempted to remove a tree branch from his roof in November 2016 (B15F/105). Examination April 2017 found full range of motion in the extremities and normal sensation (B17F/14).

(Tr. 16-18.)

Hess points to evidence consisting of a January 4, 2017 visit with his primary care physician where he was prescribed a cane for balance and gait, a written opinion by his primary care physician dated January 6, 2017, a second prescription for a cane dated February 14, 2017, and subsequent treatment notes spanning February to April 2017. (Doc. No. 17 at 13-14.) However, Hess does not identify any evidence that meets the standard articulated in SSR 96-9p, which requires documentation giving context for the need for a cane by describing the circumstances for which it is needed. In similar situations, multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for an assistive device in a claimant's RFC. *See, e.g., Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("Moreover, as [the doctor's] confirmation of a cane prescription does not indicate 'the circumstances for which [the cane] is needed,' it does not fulfill the requirements under SSR 96-9p."); *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *6 (S.D. Ohio March 13, 2019) (finding ALJ did not err in not including a limitation for a cane where physician indicated claimant would need a cane but did not describe the specific circumstances for which a cane was needed as required by SSR 96-9p); *Salem v. Colvin*, No. 14-CV-11616, 2015 WL 12732456, at *4 (E.D. Mich. Aug. 3, 2015) (finding the ALJ did not err in not including a limitation for a cane, when it had been prescribed, but the

prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane.");

*Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246, at *5 (E.D. Mich. July 21, 2017) (rejecting claimant's assertion that the ALJ failed to account for her use of a cane, stating that nothing in the physician's "mere prescription for a cane provides evidence to indicate the frequency with which the cane should be used, its purpose, or its limit upon Plaintiff's ability to perform light work" (citations omitted)).

Furthermore, as this Court has recently determined:

> [M]edical evidence that is simply consistent with the use of a cane is also insufficient. The fact remains that "[p]laintiff has not pointed to 'any medical documentation establishing that a cane is medically necessary or describing the circumstances for which it is needed, as SSR 96-[9p] requires.'" *Rodgers-Eaches v. Comm'r of Soc. Sec.*, No. 1:20-cv-69, 2021 WL 164254, at *7 (S.D. Ohio Jan. 19, 2021) (rejecting similar evidence of back impairment and ankle pain as insufficient to establish medical need for a cane) (quoting *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *6 (S.D. Ohio Mar. 13, 2019), *report and recommendation adopted,* 2019 WL 3955407 (S.D. Ohio Aug. 22, 2019)). Absent medical documentation demonstrating need and the circumstances for which the cane was needed, the ALJ was not required to include the cane in his RFC analysis.

*Stupka v. Saul*, No. 1:19-CV-2305, 2021 WL 508298, at *4 (N.D. Ohio Feb. 11, 2021).

Furthermore, the ALJ acknowledged evidence regarding Hess' use of a cane and that Hess could walk without an assistive device. (Tr. 16-18.) *See Forrester v. Comm'r of Soc. Sec.*, No. 2:16-cv-1156, 2017 WL 4769006, at *3 (S.D. Ohio. Oct. 23, 2017) ("Unlike many cases involving the use of a cane, the ALJ did not overlook evidence concerning Plaintiff's need for the cane or fail to address this issue.") (collecting cases). While the ALJ did not specifically mention the two prescriptions for a cane by Dr. Bohn, Hess' primary care physician, he cited to the records in which the January 2017 prescription was contained and acknowledged the record evidence was mixed.[4] (Tr. 17.) "[W]here there is conflicting

---

[4] While the ALJ omitted mention of the February 2017 prescription, the prescription fails to meet the requirements of SSR 96-9p. (Tr. 398.) For the reasons set forth in this opinion, any error in the ALJ's failure to mention this evidence is harmless.

evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence.'" *Forrester*, 2017 WL 4769006, at *4 (citation omitted). The ALJ's decision reflects he considered the evidence regarding Hess' use of a cane and found it not fully credible because of inconsistencies in the record. *Cruz-Ridolfi v. Comm'r of Soc. Sec.*, Case No. 1:17 CV 1075, 2018 WL 1136119, at *16 (N.D. Ohio Feb. 12, 2018), *report and recommendation adopted by* 2018 WL 1136119 (N.D. Ohio Feb. 28, 2018). Furthermore, such conflicting evidence undermines Hess' argument that a cane was medically necessary. *See Stupka*, 2021 WL 508298, at *4 ("The lack of showing required under SSR 96-9p is all the more pronounced given that the record is inconsistent, at best, as to Stupka's use of and need for a cane.")

In addition, the ALJ's reasoning regarding Hess' need for a cane is clear from his decision. The Court notes Hess does not challenge the ALJ's credibility findings.

Therefore, the ALJ's decision to exclude a cane from the RFC is supported by substantial evidence, and this assignment of error is without merit. For all the reasons set forth above, the ALJ's RFC finding is AFFIRMED.

## B. Hess' Need for a Sit/Stand Option

Hess argues the ALJ erred in evaluating the sit/stand option opined by Dr. Bohn because the ALJ's "cursory analysis" of this restriction was insufficient and lacked the support of substantial evidence. (Doc. No. 17 at 15.) Hess implies the ALJ further erred in failing to cite any specific evidence to support the ALJ's finding that Dr. Bohn's opinion was not persuasive. (*Id.* at 16.)

The Commissioner responds that substantial evidence supports the ALJ's finding that Dr. Bohn's opinion that Hess required a sit/stand option was not persuasive. (Doc. No. 18 at 15.)

Since Hess' claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See*

*Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[5] (2) consistency;[6] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior

---

[5] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[6] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ found as follows with respect to Dr. Bohn's opinions:

The undersigned notes that the record contains medical opinions from well after the date last insured, without any indication that the time period being opined on was limited to the period at issue. As noted above, the period relevant to this

decision is July 30, 2016 through December 31, 2017. Thus, the opinions from after December 31, 2017 are not persuasive because they refer to functional limitations from after the claimant's date last insured.

\* \* \*

The claimant's treating pain specialist, Timothy Bohn, M.D., opined that the claimant should not perform manual labor and should not lift, bend, push, pull, climb ladders, crawl, or stoop (B9F/3). Dr. Bohn further opined that the claimant should not be exposed to temperature extremes or foot pedals (B9F/3). He stated that the claimant must be allowed to change positions at will and has difficulty with memory, adaptation and social interaction (B26F). These opinions are not persuasive because, despite the provider's specialty and treating relationship with the claimant, they are not consistent with the available medical evidence summarized above.

(Tr. 18.)

Dr. Bohn first opined the need for a sit/stand option in April 2018, well after Hess' date last insured of December 31, 2017. (*Id.* at 1583.) The ALJ explained that there was no indication the medical opinions after the date last insured related to the relevant time period; therefore, the ALJ found them unpersuasive because they opined on Hess' functional limitations after his date last insured. (Tr. 18.) Hess fails to acknowledge this reason for rejecting Dr. Bohn's April 2018 opinion and makes no argument that the ALJ's finding was in error. (Doc. No. 17.)

In addition, the ALJ found Dr. Bohn's April 2018 opinion about the need for a sit/stand option, amongst other limitations, unpersuasive because they were inconsistent with the medical evidence summarized earlier in the opinion. (Tr. 18.) Although Hess faults the ALJ for failing to cite specific evidence that contradicted Dr. Bohn's opinion, the ALJ specifically referenced his earlier discussion of the medical evidence, which contained multiple citations to evidence in the record. *See Malone v. Comm'r of Soc. Sec.*, No. 1:10CV837, 2011 WL 5520292, at *2 (N.D. Ohio Nov. 10, 2011) ("However, the Government is correct that [the] Sixth Circuit has repeatedly emphasized the need to review the ALJ's decision as a whole.") (citing *Kornecky v. Comm'r*, 167 F. App'x 496, 508 (6th Cir. 2006)).

Therefore, the ALJ's finding Dr. Bohn's April 2018 opinion containing a sit/stand option is supported by substantial evidence, and this assignment of error is without merit. For all the reasons set forth above, the ALJ's RFC finding is AFFIRMED.

## C.    Hess' Step Five Challenge

Hess argues remand is required because the ALJ's hypotheticals to the VE "did not accurately portray" Hess' impairments as they omitted the use of a cane for walking and balancing and a sit/stand option. (Doc. No. 17 at 17.) It is clear this portion of Hess' Step Five argument is tied to his RFC arguments above. (*Id.*) As the Court explained *supra*, there is no error in the ALJ's RFC analysis.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: July 6, 2021                                      *s/ Jonathan Greenberg*
                                                                   Jonathan D. Greenberg
                                                                   United States Magistrate Judge